## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEFFON FORD-LAWRENCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-95-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Claimant, Steffon Ford-Lawrence ("Claimant"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Claimant's application for disability benefits under the Social Security Act.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Claimant appeals the decision of the  Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Claimant was born on September 24, 1968, and was 37 years old at the time of the ALJ's decision. (R.  48, 347). She has high school education with two years of college. (R.  67). Claimant worked as cashier in various capacities and also as a social services aid for the

1

Department of Human Services ("DHS). (R. 76-79).  Claimant filed an application for Disability Insurance Benefits and Supplemental Security Income on October 9, 2003. (R. 49-51).

Claimant claims disability from the date of her hospitalization on December 19, 2002. On that date, Claimant was driven to the emergency room by a family member, with Claimant's chief complaints being left leg pain and shortness of breath.  (R. 109-114, 349).  Her initial assessment showed:

1. Pulmonary embolism on the right
2.  Possible deep vein thrombosis in the left lower extremity that would be recurrent
3.  Sinusitis
4.  Asthma
5.  Morbid obesity
6.  Polyuria [excessive urination]

(R. 114)  Claimant was discharged on December 27 with the following discharge diagnoses:

1. Pulmonary embolism
2.  Left lower deep vein thrombosis ("DVT")
3.  Diabetes Mellitus Type 2, New Onset
4.  Asthma
5.  Gastroesophageal reflux disease
6.  Polyuria [excessive urination]

(R. 109)   Claimant was placed on Coumadin for her DVT, Glucophage for her diabetes, and Darvocet one by mouth every four hours as needed for pain.  She was told to continue her previous medications for asthma and gastroesophageal reflux disease.  Upon discharge, she was described as having no significant shortness of breath and ambulating without difficulty.  The discharge report states that Claimant continued to have left leg pain which was mild and

controlled with pain medicines.  (R. 109-10)    The treating physician stated that Claimant was to "limit her activity to light duty with no strenuous activity until cleared by a physician." (R.109).

The record contains files from Dr. Gerald H. Sutton from the period of December 31, 2002 to December 15, 2003 (R.163-183), with additional files covering from 2003 to September 20, 2005 received subsequent to the hearing before the ALJ[1].  (R. 233-334).  Claimant followed up with Dr. Sutton on December 31, 2002, just two days after she was discharged from the hospital.  The progress notes from this December 31, 2002 office visit make inconsistent statements regarding pain and pain medications.[2]  One note says "[s]he is not having any pain. No SOB, no chest pain."  The notes then go on to state "[t]ake plain Tylenol for pain,"  but also state "RX for Lortab."  There is a further note that "[claimant] is still having some leg pain." There is also a reference to "Rx: Darvocet."  (R. 180).

On August 1, 2003, Claimant was seen for a recheck and "for bruises very easily - on coumadin." (R.170).  Her current medications were listed as Coumadin, Trazodone, Free Style Test Strips, and Lortab.  The progress notes then state the following:

---

[1]    This Court notes that the files from Dr. Sutton's practice for 2004 and 2005 were apparently not available to the two physicians who completed Physical Residual Funcational Capacity Assessments, both in 2004.  (R.  191-198, 208-216).

[2]    The notes from Dr. Sutton's practice are computerized, typewritten notes.  Their appearance gives the impression that they are transcribed in some way from doctors' notes or oral recordings.  The use of medical abbreviations and terminology, the lack of punctuation and capitalization, the irregular spacing, and the possibility of transcription errors often makes the progress notes from Dr. Sutton's practice not completely clear.  Some of these ambiguities directly relate to the ultimate question of whether Claimant is disabled.  For this reason, this Court has quoted directly from the progress notes in many instances, because of the importance of what Claimant's treating physician is communicating in these records.  The Court has attempted to include the quotes as close to how they look in the original record as possible, including misspellings, lack of punctuation and capitalization, abbreviations, and irregular spacing.  The Court has not used the term "[sic]" in these quotations, even in regard to obvious mistakes, but has attempted to include the progress notes "as is."

> Detailed ROS shows:
> Constitutional: reports her energy level is improved   working 12-20 hours retail
> takes nap in afternoon for one hour   wakes up 3 AM   takes trazodone prn only
> takes lortab ½ tab every other day   prn pain   walking 2-3 miles a day 150
> crunches

*Id.*  The remainder of the August 1, 2003, progress notes are brief and not completely clear, but

indicate that Claimant was told to continue diet and exercise, with no apparent changes in her

medical treatment.  *Id.*

On October 16, 2003, Claimant was seen for left leg pain and shortness of breath that

woke her up while sleeping, with a reported duration of 4 days. (R.  164).  Claimant's current

medications included Coumadin, Trazodone, Free Style Test Strips, and Amaryl.   The progress

notes go on to state:

> [Claimant] also present for discomfort /pain L popliteal area   was aching but
> woke her up like charley horse   4 days ago   now aches   On coumadin 7.5 daily
> takes 2- 3 days a week   one otherdays   no bleeding   has had dysnea[3] on exertion
>   diabetes much better   on amaryl   107 fasting

At this October 16, 2003 appointment, Dr. Sutton noted "lab today   restrict activities till after

venous doppler[4]."  (R. 164).

On June 13, 2004, Claimant went to Hillcrest Medical Center emergency room for

abdominal pain.  (R. 217-232)  A CT scan showed a "hemorrhagic right ovarian cyst."  (R. 224)

Claimant was released with instructions to follow up with a doctor or gynecologist. (R. 230).

There was significant follow up with Dr. Sutton's practice through October 2004 regarding

---

[3]     There is no entry for "dysnea" in medical dictionaries, and it appears that this is a
transcription error that should have been typed as "dyspnea" which is shortness of breath.
Taber's Cyclopedic Medical Dictionary (1993).

[4]     This test was apparently never scheduled or performed as noted on a later medical consultant
review form. (R.  184).

Claimant's continued abdominal pain, with a referral to a gynecologist.  During this period, Claimant was prescribed Lortab and Flexeril. (R. 273-91).

On October 4, 2004, Claimant presented to Dr. Sutton's office.  The first page of the computerized progress notes say "See EMR" for Chief Complaint and History of Chief Complaint.  The first page also says that since Claimant had her October 12, 2002 DVT and pulmonary embolism, "she has been limiting her work to about 12 to 20 hours because of problems with swelling and pain in her leg with standing." ( R. 272).  The second page of the progress notes says Claimant presented "for left leg swellen" and "having problems sleeping," plus the following in the computerized progress notes:

> [Claimant] also presents for DVT L leg with PE 21 months ago    gets dependent
> edema with standing    also DVT about 15 years ago    plans to see  DR Weinstein
> gyn

(R. 273).  Current medications were noted as Lortab, Amaryl, Albuterol, Flexeril, Free Style Test Strips, Lotrimin, Protime, Allegra-D, Advair Diskus, Flonase, and Coumadin.  *Id.*

Claimant had complaints of coughing, including bloody mucus, and sore throat on March 22, 2005, April 19, 2005, and May 2, 2005, with prescriptions for Cephalexin, Prednisone, and Phenergan/Codeine during this time.  (R. 251, 253-54, 257).  At the April 19 appointment, Claimant reported "feeling sob at rest worse with activity," and the need to use her asthma medications and over-the-counter medications to obtain relief.  The May 2 progress note seems to reflect a telephone report from Claimant, which included continued shortness of breath. (R. 251).

At a June 9, 2005, Coumadin clinic visit, Claimant reported that she had taken five days of steroids from an emergency room visit for bronchitis/asthma symptoms.  She also reported

bleeding complications, including nose bleed, gum bleeds, and heavy menstruation for two weeks.  (R. 247).  In September, 2005, Claimant reported an increase in her use of Lortab and Amaryl to the Coumadin clinic.  (R. 233).

From April through September 2005, Claimant missed some Coumadin clinic appointments and was advised that her Coumadin medication could be discontinued and she could possibly be disenrolled from the program if her absences continued.  She was advised that failure to attend the Coumadin clinic placed her at risk for bleeding and/or clotting. (R. 235-256). On June 6, 2005, Claimant stated that she did not have the funds to pay for the appointments. (R. 250).

A pulmonary function study was performed on February 25, 2004  and showed spirometry within normal limits. (R. 185-190).   A Physical Residual Functional Capacity Assessment was performed on March 4, 2004 by a Disability Determination Center ("DDC") physician. (R. 191). The DDC physician listed Claimant's exertional limitations as follows: occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, standing about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, push and/or pull unlimited. *Id.*  No other limitations were placed on Claimant. (R. 190-198). Hand-written notes on the form seem to indicate that these conclusions were based on Claimant's status as "recovered" from her pulmonary embolism and DVT, noting no edema in the lower extremities, Claimant's anticoagulation therapy, and "walks 2-3 miles/day."  (R. 192).  The notes go on to state that Claimant alleges some shortness of breath, with the remainder of the notes unclear.  *Id.*

A Medical Consultant Review Form dated September 15, 2004 stated that a current physical exam was necessary because it was possible to have a good Pulmonary Function Study

and still have "significant problems" after a pulmonary embolism. (R. 200).  Apparently in response to this, an internal medicine consultative evaluation was done on October 27, 2004 by Dr. Steven Lee. (R. 201-07). Dr. Lee's report states that Claimant's chief complaints were history of pulmonary embolism and deep vein thrombosis, plus "light-headed when she bends over." (R. 201.  The report states that Claimant said that she was unable to work because she is not allowed to sit for prolonged periods which prevented her from performing her DHS job of transporting children long distances in the car.  Claimant said that her treating physician "advised her to stop long-distance driving because the prolonged sitting placed her at greater risk of deep vein thrombosis." *Id.*  Symptoms present at the time of the exam included mild to moderate chest pain lasting up to 20 minutes with accompanying symptoms of light-headedness, faster breathing, and harder breathing. This pain occurred two to three times per week since December 2001. These symptoms were associated with bending over or sweeping the floor and rarely occurred at rest. *Id.*  Claimant reported the current pain seemed to be less severe. *Id.*  Dr. Lee's examination appeared to consist primarily of range-of-motion testing.  (R. 203-06).  Dr. Lee's diagnosis was history of pulmonary embolism and DVT, plus "[p]robably transient postural hypotension," (R.  202), but Dr. Lee made no conclusions about Claimant's RFC.

On November 5, 2004, a second Physical Residual Function Capability Assessment was filled out, apparently by the DDC physician who had previously requested Dr. Lee's examination. (R. 208-16). These results were consistent with the limitations placed on Claimant in the previous assessment dated March 4, 2004.

**Procedural History**

On October 9, 2003, Claimant applied for disability benefits under Title II (42 U.S.C. § 401 *et seq*.), and for Supplemental Security Income benefits under Title XVI (42 U.S.C. § 1381 *et seq*.).  Claimant's application for benefits was denied in its entirety initially and on reconsideration. (R. 24, 25) A hearing before Administrative Law Judge Richard Say was held October 6, 2005, in Tulsa, Oklahoma. (R. 344). By decision dated December 9, 2005, the ALJ found that Claimant was not disabled at any time from December 19, 2002 through the date of the decision. (R. 17-23). On December 12, 2006, the Appeals Council denied review of the ALJ's findings. (R. 5-7).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[5]

---

[5]    Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's

8

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion."  *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (citation omitted). In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency."  *Id.* (citation omitted).  Nevertheless, the court examines "the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis, determines if the substantiality of the evidence test has been met."  *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991).

## Decision of the Administrative Law Judge

At Step 1, the ALJ found that Claimant was working at her liquor store job four nights a week for 4 ½ to 5 hours per night.  The ALJ found that this work activity did not rise to the level of substantial gainful activity.  (R. 18).  At Step 2, the ALJ determined that Claimant's asthma,

---

impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

post pulmonary embolism, diabetes mellitus, and obesity were severe impairments[6]. (R. 19). At

Step 3, the ALJ found that Claimant's impairments, either singularly or in combination, did not

meet or equal the severity of any listing, including Listing 3.02, chronic pulmonary

insufficiency; Listing 3.03, asthma; Listing 9.08, diabetes.  *Id.*

The ALJ found that Claimant had an RFC to perform light work that would allow her to

avoid hazards such as machinery and sharp objects. (R. 21).  At Step 4, the ALJ determined that

Claimant's RFC would allow her to perform her past relevant work. Her past job as a case

worker for DHS was sedentary in exertion and skilled work.  Her job as a cashier was light in

exertion and semiskilled work. This decision was based on the vocational expert's testimony that

Claimant could perform these jobs considering her past work and RFC. The ALJ concluded that

Claimant was "not disabled" under the Social Security Act at any time from December 18, 2002

through the date of the decision. (R. 22-23).

## Review

The Court agrees with Claimant that the ALJ's discussion and analysis in his decision

was not adequate both as to Claimant's RFC and as to the ALJ's determination of credibility.  In

*Winfrey v. Chater*, 92 F.3d 1017, the Tenth Circuit explained the three phases of the Step 4

analysis, and stated that at each phase, "the ALJ must make specific findings." *Id.* at 1023.  The

first phase is determination of a claimant's RFC, which is what an individual can still do despite

her impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Social Security Ruling ("SSR")

96-8p further explains that an RFC

---

[6]   The Court notes that the ALJ did not include Claimant's DVT as a severe impairment at Step 2.
Claimant does not include this omission among her allegations of error, and therefore the Court does
not address it, but notes that this should be addressed by the ALJ on remand.

is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities. . . . RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis; . . . [i.e.,] 8 hours a day, for 5 days a week, or an equivalent work schedule.  RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.

SSR 96-8p, 1996 WL 374184 at *2.

In evaluating a claimant's RFC, the ALJ must consider all the relevant evidence, including, *inter alia,* medical history, medical signs and laboratory findings, any effects from treatment, a claimant's daily activities and testimony, effects of symptoms, such as pain, attributed to medically determinable impairment, and medical source statements.[7]  *Id*. at *5.  The RFC assessment must address a claimant's exertional and nonexertional capacities based on the relevant evidence.  Exertional capacity includes any limitation in the following seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling.  *Id*.  Nonexertional capacity includes all work-related physical limitations not dependent on an individual's physical strength, as well as mental limitations and environmental restrictions. *Id*. at *6.  Symptoms, such as pain, can present exertional or nonexertional impairment or both. *Id*.;  *Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir.1988).  If pain limits a claimant's ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, pulling),  it imposes an exertional

---

[7]  "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis," and are "based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual." SSR 96-5p, 1996 WL 374183 at *4.  The medical opinions of treating physicians concerning the nature and severity of a claimant's impairment(s), in particular, are entitled to "special significance," whether or not they are accorded controlling weight. *Id*.  "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7.

limitation. 20 C.F.R. §§ 404.1569a(b), 416.969a(b).  If pain limits a claimant's ability to meet demands of a job other than strength demands, it imposes a nonexertional limitation. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

The ALJ reviewed, briefly, Claimant's medical history, then her credibility, and then came to the conclusion that she could perform light work.  (R. 19-21).  There is no analysis in this part of the decision that would allow this Court to determine how the ALJ concluded that Claimant's substantial 3-year medical history from December 2002 to the date of the decision in December 2005 of pulmonary embolism, DVT, diabetes, asthma, and pain would still allow her to perform light work.  The paragraph of the decision following the RFC determination appears to be the ALJ's explanation, and the reasons given do not constitute substantial evidence.

First, the ALJ states that Claimant's treating physicians "did not place any functional restrictions on her activities that would preclude light work activity with the previously-mentioned restrictions."  (R. 21).  To the contrary, the record includes several entries in which her treating physicians indicated that Claimant had a limited ability to work.  First, when Claimant left the hospital after her December 2002 bout with pulmonary embolism and DVT, the treating physician said that Claimant was to "limit her activity to light duty with no strenuous activity until cleared by a physician."  (R. 109).  In October 2003, Dr. Sutton's note indicate that Claimant was to "restrict activities" until after a test relating to her DVT was performed, apparently because Claimant had continuing leg pain.  (R. 164).  Claimant told the examining physician that her treating physician had advised her not to work at a job that required long-distance driving due to the increased risk of prolonged sitting on her DVT.  (R. 201).  Claimant's testimony at the hearing was that her doctor had told her that she couldn't work at her DHS job.

(R. 352). Claimant also testified that her doctors had told her that sitting and standing for prolonged periods were a problem because of her complications of bleeding caused by her blood thinner, causing anemia.  (R. 356).

All of this is evidence from Claimant's treating physicians that would conflict with the ALJ's finding that Claimant can do light work.  A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it.  *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir.1987); *Goatcher v. U.S. Dept. of Health & Human Services*, 52 F.3d 288, 289-90 (10th Cir. 1995).   When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around.  *Goatcher*, 52 F.3d at 290 (citing *Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988).  The ALJ may reject a treating physician's report if it is brief, conclusory and unsupported by medical evidence.  *Frey*, 816 F.2d at 513; *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). However, if the treating physician's medical opinion is to be disregarded, specific, legitimate reasons for doing so must be set forth.  *Eggleston v. Bowen*, 851 F.2d 1244, 1246-47 (10th Cir. 1988).  Because the ALJ ignored the evidence that Claimant's treating physicians had restricted her ability to work, and therefore did not give specific, legitimate reasons why those limitations should be disregarded, the ALJ's decision is erroneous.

The next few sentences of the ALJ's decision may be an attempt to explain somewhat how the ALJ came to his decision regarding Claimant's RFC.  He states that Claimant told Dr. Sutton in August 2003 that she was working 12 to 20 hours in retail, and that she was walking two to three miles a day and doing 150 crunches.  This is followed by the ALJ's conclusory

13

statement that "[C]laimant's daily activities are consistent with the performance of light work."

First, the statement regarding walking two to three miles and doing 150 crunches is contradicted

by multiple other entries in the progress notes of Dr. Sutton by implication because Claimant

described being short of breath and having continuing pain in her leg.  For example, the episode

when Dr. Sutton stated that Claimant was to "restrict activities" until after a test relating to her

DVT was performed was in October 2003, just a few months after the August 2003 entry

referred to by the ALJ.  "An ALJ is not entitled to pick and choose through an uncontradicted

medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga v.*

*Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).  Here the ALJ picked one relatively early entry

(eight months after the December 2002 hospitalization) from Dr. Sutton to support his finding,

and he ignored multiple entries, over the three-year period following the hospitalization that do

not support his RFC finding.  The August 2003 entry is not substantial evidence supporting the

ALJ's RFC finding.

Second, the ALJ referred to Claimant's working 12 to 20 hours per week in relationship

to RFC, apparently as evidence that  Claimant's daily activities are consistent with light work,

and the ALJ also cites it in his credibility determination.  This Court finds that Claimant's part-

time work does not constitute substantial evidence either supporting the ALJ's determination of

Claimant's RFC or supporting the ALJ's credibility determination.  In the credibility portion of

the decision, the ALJ states that Claimant's part-time work "reflects an ability to function better

than she alleged at the hearing."  (R. 21).  The Tenth Circuit has noted with approval decisions in

other circuits that the "capability to work only a few hours per day does not constitute the ability

to engage in substantial gainful activity."  *Garcia v. Barnhart*, 188 Fed. Appx. 760, 762 (10th

14

Cir. 2006)(*quoting Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)).  *See also Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001)(part-time work does not equate with finding that a claimant can work on a daily basis in the working world, and consistent prior work history supports credibility); *Cline v. Sullivan*, 939 F.2d 560, 565-66 (8th Cir. 1991)(ALJ should not penalize a claimant who "attempts to make ends meet by working in a modest, part-time job").

In the present case, Claimant has been frank and forthcoming in describing her part-time work.  Prior to her December 2002 incident with the pulmonary embolism and DVT, Claimant worked full-time for DHS and then worked approximately 30 additional hours at a liquor store. (R. 350, 351-52).  After the December 2002 hospitalization, Claimant returned to the job at the liquor store, but with significant accommodations and greatly reduced hours, to approximately 12-20 hours per week, and only four nights a week.  (R. 352).   One accommodation was to change her job so that she could sit down, and another one was to move her desk downstairs, because she fell twice at work.  (R. 352, 360-61).  Claimant also testified that she rested as much as she could during the day because "working those couple of hours take a lot out of me."  (R. 357).  Under these circumstances, the ALJ's citation of Claimant's modest part-time job in support of his finding both of Claimant's ability to perform light work and of Claimant's lack of credibility does not constitute substantial evidence supporting these findings.

The only other factor that the ALJ cited in support of his credibility finding was a purported "noncompliance with medical treatment."  (R. 21)  The ALJ bases this conclusion on Claimant's missing appointments to have her blood checked at the Coumadin clinic during the time frame of April through September 2005.  (R. 235-56).  The Court has doubts about the factual question of whether Claimant missing some appointments could constitute

15

noncompliance, given her overall record of compliance and significant contacts with Dr. Sutton's office since the December 2002 hospitalization.  However, even if this claim has factual validity, it fails the first prong of the Tenth Circuit's four-part test to assess a claimant's failure to pursue treatment.  *See Adkins v. Barnhart*, 80 Fed. Appx. 44, 50 (10th Cir. 2003)(*citing Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).   The first requirement is that the treatment would have restored the claimant's ability to work.  *Id.*  In the present case, Claimant's consistency in having her blood checked due to her blood thinners is not causally related to her inability to work in any way.  There is no evidence that if Claimant had attended every scheduled appointment at the Coumadin clinic this would have enabled her to return to work full-time.  The ALJ's citation of this purported noncompliance in support of his finding regarding credibility was erroneous.  Because both of the factors relied upon by the ALJ in support of his credibility finding were erroneous, his determination is not supported by substantial evidence in the record, and it requires reversal.  *See Hayden v. Barnhart*, 374 F.3d 986, 993-94 (10th Cir. 2004)(ALJ's erroneous citation of medical records was not substantial evidence supporting credibility determination); *Hardman v. Barnhart*, 362 F.3d 676, 680 (10th Cir. 2004)(quoting SSR 96-7p "a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.").

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this order.

IT IS SO ORDERED,  this 15th day of August, 2008.

Paul J. Cleary
United States Magistrate Judge